CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED
NOV 16 2005
JOHN F. CORCORAN, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
BIG STONE GAP DIVISION

| | |
|---|---|
| MARK D. GULLEY,<br>    Plaintiff, | )<br>)<br>) |
| v. | )     Civil Action No. 2:04cv00064<br>)<br>)     **MEMORANDUM OPINION**<br>) |
| JO ANNE B. BARNHART,<br>  **Commissioner of Social Security,**<br>    Defendant. | )<br>)     By:    GLEN M. WILLIAMS<br>)     Senior United States District Judge |

In this social security case, the court remands and vacates the final decision of the Commissioner denying benefits.

*I. Background and Standard of Review*

The plaintiff, Mark D. Gulley, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying the plaintiff's claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2003). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517

-1-

(4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws,* 368 F.2d at 642).

The record shows that Gulley filed an application for DIB on or about December 13, 2002, alleging disability as of May 26, 2002, due to a fracture of the C4 vertebrae, which caused a bulging disc and three herniated discs. (Record, ("R."), at 44-47, 57.) His claim was denied initially and on reconsideration. (R. at 29-33, 35-37.) Gulley then requested a hearing before an administrative law judge, ("ALJ"). (R. at 38.) The ALJ held a hearing on February 26, 2004, during which Gulley was represented by counsel. (R. at 220-238.)

By decision dated March 22, 2004, the ALJ denied Gulley's claim. (R. at 13-21.) The ALJ found that Gulley was insured for DIB purposes through the date of his decision. (R. at 20.) Furthermore, the ALJ found that Gulley had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 20.) The ALJ found that the medical evidence established that Gulley suffered from severe impairments, namely his chronic neck pain and shoulder pain with a history of fracture at the C4 level, chronic thoracic pain and borderline intellectual functioning. (R. at 20.) However, the ALJ found that these impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at

Case 2:04-cv-00064-GMW-PMS   Document 21   Filed 11/16/05   Page 2 of 20   Pageid#: 78

20.) The ALJ also found that Gulley's allegations regarding his limitations were not totally credible. (R. at 20.) The ALJ further found that Gulley had the residual functional capacity to perform simple, unskilled jobs at the light[1] level of exertion that did not require repetitive turning of his head. (R. at 20.) Based on Gulley's age, education, work experience and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs that Gulley could perform were available in significant numbers, such as work as a security guard, night watchman, assembler, sorter, inspector or checker. (R. at 21.) Thus, the ALJ found that Gulley was not under a disability as defined by the Act at any time through the date of the decision and not eligible for benefits. (R. at 21.) *See* 20 C.F.R. § 404.1520 (g) (2005).

After the ALJ issued his opinion, Gulley pursued his administrative appeals, (R. at 9), but the Appeals Council denied his request for review. (R. at 5-7.) Gulley then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2005). The case is before this court on the Commissioner's Motion For Summary Judgment, filed March 4, 2005, (Docket Item No. 18), and Gulley's Motion For Summary Judgment filed December 2, 2004. (Docket Item No. 11.)

---

[1] The Social Security regulations define "light work" as work that involves lifting objects weighing no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. If someone can do light work, he also can do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time. 20 C.F.R. § 404.1567(b) (2005).

-3-

## II. Facts

Gulley was born in 1967, (R. at 44), which classifies him as a younger person under 20 C.F.R. § 404.1563(c). Gulley has a tenth-grade education and does not have a general equivalency diploma, ("GED"), or any vocational training beyond high school. (R. at 224.)

At his hearing, Gulley testified that his last employment was with Western Waterproofing, where he had worked as a cement finisher, caulker and brick mason. (R. at 225.) Gulley stated that he had been employed in this position for 10 years. (R. at 225.) Gulley testified that prior to his employment with Western Waterproofing, he had worked for D.C. Byers Company for five years in the same capacity. (R. at 225.) For both employers, Gulley razed buildings with swing stages, laid brick, sprayed concrete out of a hose, sandblasted and poured concrete. (R. at 226.) Gulley testified that these duties involved substantial lifting, stooping and bending and some crawling. (R. at 226.)

Gulley testified that on May 26, 2002, he suffered a broken C4 vertebrae and a herniated disc in his neck and chest area from diving into a shallow pond and hitting an island in the pond. (R. at 226.) Gulley further testified that his injuries did not require surgery, but he received treatment from Dr. Norine M. Tracy, M.D., in Michigan. (R. at 226.) Gulley understood from his doctors that surgery would be too dangerous to perform. (R. at 227.) According to Gulley's testimony, Dr. Tracy feared that if Gulley was particularly active, paralysis could result. (R. at 227.)

When asked to describe his pain, Gulley stated that it felt as if someone was driving a stake into his heart and lungs. (R. at 229.) Gulley also described shooting pains and cramps in his legs, particularly in his right leg. (R. at 229.) Gulley testified that he dressed himself but had difficulty putting on shirts because his right arm would give out on him. (R. at 229.) Gulley further testified that he had a driver's license, but he only drove short distances. (R. at 229.) Gulley stated that during long drives, he had to stop occasionally because the bouncing bothered him. (R. at 230.) Gulley testified that he could not mow the lawn because of the bouncing. (R. at 230.) Gulley also testified that he suffered from neck, chest, back and groin pain. (R. at 230, 233.) Gulley described that it was painful to turn his head from side to side. (R. at 233.) All of this pain, Gulley testified, caused him to be depressed. (R. at 233.) Gulley testified that his depression prevented him from spending time with his children, and the tension associated with his depression aggravated his pain. (R. at 233.) Gulley testified that he took fentanyl by a patch for his pain and Percocet and Valium to help him sleep but took no medication for his depression. (R. at 231, 234.) Gulley stated that the fentanyl caused constipation and the Percocet made him feel drunk and caused an upset stomach. (R. at 234.)

When asked about his daily routine, Gulley stated that he took it easy and tried unsuccessfully to help his wife around the house and with their three-month-old baby. (R. at 226, 228.) Gulley testified that he could not play or take care of their baby because of pain. (R. at 228.) Gulley also testified that he occasionally picked his daughter up from her school, which was located approximately a mile and half from his house. (R. at 235.) Gulley further testified that he could sit for only a half an hour or an hour without having to stand and could stand for an hour before having to sit.

(R. at 232.) Gulley stated that the pain forced him to lie down during the day. (R. at 232.) Gulley also described sleep difficulty and testified that he slept for only an hour or an hour and a half at a time before he awoke. (R. at 227-28.)

Norman Hankins, a vocational expert, also testified at Gulley's hearing. (R. at 235.) Hankins was asked to consider Gulley's past work experience. (R. at 235.) Hankins described the position of brick mason as "medium and skilled," the position of concrete finisher as "heavy and skilled," the position of caulker as "medium and semi-skilled" and the position of construction labor worker as "heavy and unskilled." (R. at 236.) Hankins was then asked to consider Gulley's age, education and past relevant work experience and to assume that Gulley was restricted to light work that did not require him to repetitively turn his head . (R. at 236.) Hankins testified that there were jobs in the regional or national economy that Gulley could perform such as security guard and night watchman. (R. at 236.) Hankins also testified that Gulley could work in factories where he could sit or stand at a table and perform activities such as sorting, inspecting, checking and assembling. (R. at 236.) Hankins further stated that there were approximately 50,000 light and sedentary jobs in the Virginia economy and more than 2 million in the national economy. (R. at 236-37.)

Hankins was asked to consider the same hypothetical but with the limitations as set forth in a psychological evaluation administered by B. Wayne Lanthorn, Ph.D., on February 16, 2004. (R. at 237.) Hankins stated that these limitations would eliminate all jobs from Gulley's job base. (R. at 237.)

In rendering his decision, the ALJ reviewed medical records from McPherson

Hospital; Dr. Gregory Graziano, M.D.; the University of Michigan; Dr. Norine M. Tracy, M.D.; and B. Wayne Lanthorn, Ph.D. (R. at 15-17.)

On May 28, 2002, Gulley was seen at the emergency room at McPherson Hospital, complaining of neck pain and shoulder pain that he described as both dull and sharp. (R. at 128-34.) Gulley reported that he had dove into a pond two days prior and hit his head on the bottom of the pond. (R. at 130.) X-rays and a CT scan showed a C4 fracture with slight posterior subluxation in the body at the C4 level in relation to the C5 level. (R. at 131.) There was no posterior element involvement, the retropharyngel soft tissues were unremarkable and the bony neural foramen were intact. (R. at 131.) Gulley was given a hard C-Spine collar and transferred to the University of Michigan. (R. at 132, 134.) Once at the University of Michigan, a physical examination was performed. (R. at 140.) Robert Ayotte, P.A., noted that Gulley's grip was 5/5 bilaterally and all upper extremity range of motion and strength tests were normal and intact bilaterally. (R. at 140.) Gulley also was neurologically intact. (R. at 140.) Gulley was diagnosed with a fracture at the C4 level. (R. 138.) Dr. Edward A. Walton, M.D., placed Gulley in an Aspen collar, prescribed Motrin for his pain and advised Gulley to rest until he had a follow-up examination with orthopedics. (R. at 138-39.)

On June 7, 2002, Gulley returned to McPherson Hospital to have follow-up x-rays taken of his cervical spine. (R. at 126-27, 163.) The x-rays showed healing of the fourth vertebral fracture, no change in alignment of the bony structures and no new fractures. (R. at 126, 163.). Dr. Gregory Graziano, M.D., from the University of Michigan continued Gulley's use of the Aspen collar and Motrin and prescribed

Vicodon and Flexeril. (R.at 153.) Also on this date, Gulley visited his primary care physcian, Dr. Norine M. Tracy, M.D., for a follow-up appointment for his neck pain. (R. at 154.) Dr. Tracy prescribed Vicodan and Flexeril for his pain, continued his use of Motrin and recommended an orthopedics consultation. (R. at 153.) Dr. Tracy continued to treat Gulley for his pain through July 31, 2003. (R. at 145-54.)

On June 14, 2002, Gulley again returned to McPherson Hospital for a follow-up exam, where it was reported that there was a subtle increased posterior displacement at the C4 level in relation to the C5 level. (R. at 164.) X-rays were taken on June 20, 2002, at the University of Michigan, which showed no significant change in the appearance of the anterior compression fracture at the C4 level and minimal retrolisthesis of C4 upon C5. (R. at 143.)

On June 25, 2002, Gulley had another follow-up appointment at the University of Michigan (R. at 137.) X-rays indicated that Gulley's cervical spine had good alignment, and there was no increase in the retrolisthesis at the C4 level on the C5 level. (R. at 137.) Dr. Graziano recommended that Gulley continue his use of the Aspen collar and remain on weight lifting restrictions of lifting no items weighing more than five to 10 pounds. (R. at 137.)

On July 26, 2002, Gulley visited the University of Michigan for an examination with Dr. Graziano. (R. at 135.) Gulley complained of pain in his right shoulder and right elbow, especially when hyperextending his right arm. (R. at 135.) Gulley also complained of some generalized aches and pains and some feelings of chest pain anteriorly. (R. at 135.) X-rays were reviewed at this appointment, which showed that

the C4 fracture was stable with two to three millimeters of listhesis anteriorly. (R. at 135.) The x-rays also showed some slight compression of the C4 body; however, Dr. Graziano opined that it now appeared to have a more chronic look. (R. at 135.) Dr. Graziano also found that there was continued splaying at the posterior elements of the C4-5 level, which was stable, and there was no evidence of right shoulder subluxation, dislocation or fracture. (R. at 142.) Dr. Graziano recommended weaning Gulley from his Aspen collar over the next couple weeks and physical therapy. (R. at 135.)

On July 10, 2002, Gulley visited Dr. Tracy for a follow-up appointment. (R. at 152.) Gulley related that the Vicodin helped but the Flexeril made his pain worse. (R. at 152.) Dr. Tracy prescribed Naprosyn, Vicodin and Trazadone. (R. at 154.)

On August 26, 2002, Gulley visited McPherson Hospital because of chest pain and difficulty breathing that he had experienced while attending physical therapy. (R. at 114-15, 122-25.) Gulley indicated that the pain was worsened by deep breathing and exertion, particularly moving his neck. (R. at 114.) Chest images were taken, and they showed that his heart size and pulmonary vessels were within normal limits and that his lungs and pleural spaces were clear. (R. at 162.)

On October 20, 2002, Gulley returned to McPherson Hospital for a follow-up exam of his cervical spine. (R. at 110.) Images were taken and revealed that there was a healed fracture deformity of the C4 vertebral body, minimal anterior compression as a result of the fracture and a loss of the normal cervical lordosis at this level without frank subluxation. (R. at 110.) The images also revealed that the C3-4 disc was unremarkable; however, at the C4-5 level, there was a broad-based disc bulge, which

followed the spondylitic change, which impinged on the anterior portion of the thecal sac but did not cause spinal stenosis and did not significantly narrow either neural foramen. (R. at 110.)

Gulley returned to McPherson Hospital for a pain institute consultation on November 5, 2002. (R. at 189-91.) Gulley reported that he had stopped taking his medications because he felt they did not work. (R. at 189.) Gulley complained of pain in his neck, arms and chest area and described it as being constant, burning, tingling, pounding, sharp, shooting, throbbing and aching with tingling down his fingers. (R. at 189.) Dr. Yi-Shiuan Judy Lee, M.D., reported that Gulley had chronic pain syndrome, mostly involving the total body but with worse pain in the cervical, chest and arm area. (R. at 190.) Dr. Lee also found a C4 fracture with a disc bulging and cervical radiculitis and possible biceps tendinitis. (R. at 190.) Dr. Lee recommended that Gulley undergo a trial of cervical epidural steroid injections to treat his cervicalgia, possible cervical radiculitis and related pain; he agreed to proceed with the treatment. (R. at 190.)

On November 11, 2002, Gulley underwent an interlaminar cervical epidural steroid injection at C6-7. (R. at 183-84.) Gulley underwent the same procedure on December 10, 2002. (R. at 178.)

On February 25, 2003, Gulley returned to Dr. Tracy's office for a follow-up exam of his neck. (R. at 150.) Gulley complained of neck pain, headaches and occasional numbness in his hands. (R. at 150.) Dr. Tracy found that there was tenderness at the C4 level and paraspinal muscle tension at C2-5. (R. at 150.)

On March 24, 2003, Dr. Frank M. Johnson, M.D., a state agency physician, completed a physical residual functional capacity assessment on Gulley. (R. at 197-204.) Dr. Johnson concluded that Gulley could occasionally lift and/or carry items weighing up to 50 pounds, frequently lift and/or carry items weighing up to 25 pounds, stand and/or walk about six hours in an eight-hour workday and sit with normal breaks for about six hours in an eight-hour workday. (R. at 198.) Dr. Johnson found that Gulley could frequently climb ramps and stairs, balance, stoop, kneel, crouch and crawl but could never climb ladders, ropes or scaffolds. (R. at 199.) Dr. Johnson assessed that Gulley had no manipulative limitations, visual limitations, communicative limitations or environmental limitations. (R. at 200-02.) Dr. Johnson's findings were affirmed on August 7, 2003, by Dr. Donald R. Williams, M.D., another state agency physician. (R. at 204.)

Gulley returned to McPherson Hospital on May 2, 2003, complaining of a recent pop in his neck and resulting pain and tingling into his arms and legs. (R. at 99.) A MRI was taken of Gulley's cervical spine, and the images showed the old fracture of the C4 vertebra with no acute abnormality. (R. at 104.) Gulley was given Valium, ibuprofen and Endocet. (R. at 149.)

On May 30, 2003, Gulley visited Dr. Tracy to have disability papers completed. (R. at 148.) Gulley reported sleep difficulty and stated that the Percocet dulled his pain only slightly. (R. at 148.)

On June 2, 2003, Dr. Tracy wrote a letter stating that according to Gulley's MRI, there had been some chronic changes to his C4 area. (R. at 171). Dr. Tracy noted that

Gulley could not work or drive to work because of the Percocet that Gulley needed to control his pain. (R. at 171.) She further stated that he could not perform most household chores such as vacuuming, mowing, washing dishes and could not lift items weighing more than 10 pounds. (R. at 171.) She concluded her letter by stating that she could not imagine a job in which Gulley could work given his skills and current symptoms. (R.at 171.) When Dr. Tracy saw Gulley on June 24, 2003, she found that Gulley had tenderness in the neck, T8 and lumbar spine area. (R. at 147.)

On June 29, 2003, Gulley returned to McPherson Hospital to have a MRI of his thoracic spine performed. (R. at 158.) The images showed a deformity of C4, which was previously described as a remote fracture, and minimal dextroconvex scoliosis of the upper thoracic spine. (R. at 158.) The images also showed that at the T7-8 level there was a left paramedian disc bulge, which impinged on the anterior portion of the thecal sac but did not significantly narrow the neural foramen and did not cause spinal stenosis. (R. at 158.)

On July 14, 2003, Gully returned to Dr. Tracy to discuss his MRI and a bruise on his lower back, which caused pain. (R. at 146.) Dr. Tracy reported that Gulley was currently taking Valium, Percocet and Motrin. (R. at 146.)

On September 14, 2003, Dr. Tracy performed a Medical Assessment Of Ability To Do Work Related Activities (Physical) on Gulley. (R. at 172-73.) Dr. Tracy concluded that Gulley could lift/carry items weighing 10 to 15 pounds, with items weighing 30 pounds being the maximum Gulley could carry occasionally and items weighing five pounds being the maximum Gulley could carry frequently. (R. at 172.)

However, Dr. Tracy also found that Gulley's impairment should not affect standing, walking or sitting, but that he did have some limitations bending his torso and neck. (R. at 172.) Dr. Tracy concluded that Gulley could frequently balance, stoop, crouch and kneel but could never climb or crawl because of Gulley's pain with neck movement. (R. at 173.) Dr. Tracy further found that reaching, feeling, seeing, hearing and speaking were not affected by Gulley's impairment but that bending could be affected if Gulley bended at the neck or back. (R. at 173.) Dr. Tracy finally stated that Gulley had no environmental restrictions but that heights could be difficult due to the need for balance. (R. at 173.) The next day, Dr. Tracy noted that any neck movement exacerbated Gulley's pain and stiffened his neck, shoulder and arms, and she did not expect Gulley's condition to improve in the near future. (R. at 170.)

On February 16, 2004, B.Wayne Lanthorn, Ph.D., performed a psychological evaluation on Gulley. (R. at 207-14.) Gulley was able to perform only one step of serial sevens correctly before going completely awry and appearing to get confused by the task. (R. at 208.) Lanthorn found Gulley well-oriented with no signs of delusional thinking nor any indications of psychotic processes. (R. at 208.) Based on the results of a Wechsler Adult Intelligence Scale-Third Edition, ("WAIS-III"), Gulley's verbal IQ score was 81, his performance IQ score was 77 and his full-scale IQ score was 77. (R. at 208.) Lanthorn opined that Gulley occasionally displayed the self-mocking grin of the severely depressed. (R. at 209.) On the Pain Patient Profile, ("P/3"), Gulley scored in the most extreme level of severity at all three scales. (R. at 212.) Lanthorn noted that Gulley's test results indicated that on the somatizaion scale, he was quite troubled by his physical problems, and the pain had a negative effect on his life. (R. at 212.) Lanthorn further found that Gulley's pain and suffering caused him to be

distracted. (R. at 212.) Lanthorn diagnosed Gulley with a major depressive disorder, a general anxiety disorder, a pain disorder associated with both psychological factors and a chronic general medical condition and borderline intellectual functioning. (R. at 213.) Lanthorn also found that Gulley had marked problems with cognitive functions, including poor concentration, significant short-term memory loss, enervation and difficulties in initiating and persisting at tasks, social withdrawal, plummeting degree of self-esteem, difficulties with planning abilities and difficulties with decision-making. (R. at 213-14.) Lanthorn concluded that taking all factors into consideration, Gulley was judged to have a moderately severe limitation in his overall adaptability skills, and that he was in need of on-going psychotherapy, as well as a psychiatric evaluation to establish the need for additional psychotropic medications for his multifaceted and severe current difficulties. (R. at 214.)

Lanthorn also completed a Medical Assessment of Ability To Do Work-Related Activities (Mental) on February 16, 2004. (R. at 215-17.) Lanthorn indicated that in making occupational adjustments, Gulley would have a fair ability to follow work rules and function independently, while he would have a poor or no ability to relate to co-workers, deal with the public, use judgment, interact with supervisors, function independently, maintain attention and concentration and handle work stresses. (R. at 215.) Lanthorn found that Gulley's major depressive disorder, generalized anxiety disorder, pain disorder associated with both psychological factors and a general medical condition and borderline intellectual functioning support his conclusion. (R. at 215.) In evaluating Gulley's ability to make performance adjustments, Lanthorn found that Gulley would have a good ability to understand, remember and carry out simple job instructions, a fair ability to understand, remember and carry out detailed

instructions and a poor ability to understand, remember and carry out complex job instructions. (R. at 216.) Lanthorn also determined that in making personal and social adjustments, Gulley would have a fair ability to maintain his personal appearance and behave in an emotionally stable manner but would have a poor or no ability to relate predictably in social situations and demonstrate reliability. (R. at 216.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520; *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520 (2005). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2005).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy the burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2) (West 2004); 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2003); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658

-15-

F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated March 22, 2004, the ALJ denied Gulley's claim. (R. at 13-21.) The ALJ found that Gulley was insured for DIB purposes through the date of his decision. (R. at 20.) Furthermore, the ALJ found that Gulley had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 20.) The ALJ found that the medical evidence established that Gulley suffered from severe impairments, namely his chronic neck pain and shoulder pain with a history of fracture at the C4 level, chronic thoracic pain and borderline intellectual functioning. (R. at 20.) However, the ALJ found that these impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 20.) The ALJ also found that Gulley's allegations regarding his limitations were not totally credible. (R. at 20.) The ALJ further found that Gulley had the residual functional capacity to perform simple, unskilled jobs at the light level of exertion that did not require repetitive turning of his head. (R. at 20.) Based on Gulley's age, education, work experience and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs that Gulley could perform were available in significant numbers, such as work as a security guard, night watchman, assembler, sorter, inspector or checker. (R. at 21.) Thus, the ALJ found that Gulley was not under a disability as defined by the Act at any time through the date of the decision and not eligible for benefits. (R. at 21.) *See* 20 C.F.R. § 404.1520 (g) (2005).

Gulley argues the ALJ's decision was not based on the substantial evidence of the record. (Memorandum In Support Of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), at 1.) Specifically, Gulley argues that the ALJ erred in finding

that Gulley's chronic neck, shoulder and thoracic pain and borderline intellectual functioning were not severe enough to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Plaintiff's Brief at 4.) Gulley further argues that the ALJ erred by discrediting the opinions of Dr. Tracy, Gulley's treating physican, and instead giving controlling weight to the state agency physician's opinion. (Plaintiff's Brief at 4.) Gulley also argues that the ALJ erred in discrediting Gulley's subjective allegations of pain. (Plaintiff's Brief at 4.) Finally, Gulley argues that the ALJ erred in finding that Gulley could perform simple, unskilled jobs at the light level of exertion that did not require repetitive turning of the head. (Plaintiff's Brief at 4.)

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the

-17-

regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d), if he sufficiently explains his rationale and if the record supports his findings.

I will first address Gulley's argument that the ALJ erred in discrediting Gulley's subjective allegations of pain. I find that the ALJ did not consider Gulley's allegations of pain in accordance with the regulations. The Fourth Circuit has adopted a two-step process for determining whether a claimant is disabled by pain. First, there must be objective medical evidence of the existence of a medical impairment, which could reasonably be expected to produce the actual amount and degree of pain alleged by the claimant. *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). Second, the intensity and persistence of the claimant's pain must be evaluated, as well as the extent to which the pain affects the claimant's ability to work. *Craig*, 76 F.3d at 595. Once the first step is met, the ALJ cannot dismiss the claimant's subjective complaints simply because objective evidence of the pain itself is lacking. *Craig*, 76 F.3d at 595. This does not mean, however, that the ALJ may not use objective medical evidence in evaluating the intensity and persistence of pain. In *Craig*, the court stated:

> Although a claimant's allegations about his pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges he suffers....

76 F.3d at 595.

I find that substantial evidence does not support the ALJ's finding that Gulley's subjective complaints of functional limitations were not credible. Although the ALJ found that Gulley had musculoskeletal impairments that could reasonably be expected to cause some pain or discomfort, he then found that the medical evidence failed to reveal findings to support pain to the degree alleged. (R. at 18-19.) However, the record reflects that Gulley suffered a C4 fracture with slight posterior subluxation in the body at the C4 level in relation to the C5 level upon hitting his head at the bottom of a pond and continued to suffer from associated complications. (R. at 110, 131, 135.) In particular, x-rays showed compression of the C4 body, retrolisthesis of C4 upon C5 and a broad-based disc bulge, which impinged on the anterior portion of the thecal sac. (R. at 110, 135, 143, 164, 190.) These findings do support Gulley's allegations of pain in his neck, chest and arms. Gulley's pain was so severe that he received interlaminar cervical epidural steroid injections and constantly took pain medication since his injury. (R. at 149, 153-54, 178, 183-84.) The ALJ found pertinent Gulley's daily activities, which merely consisted of helping with his children, watching over a few pets, socializing with his family and occasionally going to the supermarket. (R. at 19.) Yet these minimal attempts at fulfilling his familial obligations do not direct a conclusion that Gulley's allegations of pain were not credible, especially in light of the fact that Gulley stated at his hearing that he could not play or take care of his baby because of his pain and only occasionally picked his daughter up from school. (R. at 228, 235.) Since the ALJ found that the medical evidence does not support pain to the degree alleged, he did not evaluate the intensity and persistence of Gulley's pain. Therefore, I find that substantial evidence does not support the ALJ's finding that Gulley's subjective allegations of pain were not credible.

Case 2:04-cv-00064-GMW-PMS Document 21 Filed 11/16/05 Page 19 of 20 Pageid#: 95

## IV. Conclusion

For the foregoing reasons, I will overrule the respective motions for summary judgment, vacate the Commissioner's decision denying benefits and remand Gulley's claim for further consideration.

An appropriate order will be entered.

DATED:     This 16th day of November 2005.

*/s/ Glen M. Williams*
SENIOR UNITED STATES DISTRICT JUDGE